# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**SHIRLEY HITSON, MARY WOOD**
**and WILBERT HART,**

Plaintiffs

vs.                                                            **No. CIV 01-0966 LCS/KBM-ACE**

**FIRST SAVINGS BANK, PERFORMANCE**
**BANKERS, INC., BRENT DYKSTRA**
**and BRIAN YARRINGTON,**

Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** came before the Court on Defendants First Savings Bank (FSB), PBI and

Brent Dykstra's Motion to Strike (Doc. 140), filed September 3, 2002; Defendant Brian Yarrington's

Motion to Strike (Doc. 155 ), filed September 3, 2002; Defendant Performance Bankers, Inc.'s

(PBI's) Motion for Summary Judgment, (Doc. 116), filed August 9, 2002; Defendant Dykstra's

Motion for Summary Judgment, (Doc. 119), filed August 9, 2002; Defendant Yarrington's Motion

for Summary Judgment on Count V of Plaintiff's First Amended Complaint (Doc. 98); Defendant

Yarrington's Motion for Summary Judgment on Count VIII of Plaintiff's First Amended Complaint

(Doc. 99); Defendant Yarrington's Motion for Summary Judgment on Count X of Plaintiff's First

Amended Complaint (Doc. 100), filed August 6, 2002; Defendants FSB, PBI and Dykstra's Motion

for Summary Judgment as to Claims by Shirley Hitson (Doc. 101); and Defendants FSB, PBI, and

Dykstra's Motion for Summary Judgment as to Claims by Wilbert Hart (Doc. 113), filed August 9,

2002. The United States Magistrate Judge, acting upon consent and designation pursuant 28 U.S.C.

§ 636(c), and having considered the briefs, submissions, relevant law, and being otherwise fully advised, finds that Defendants PBI, Dykstra and Yarrington's Motions are well-taken and should be **GRANTED** and that Defendant FSB's Motions are well-taken in part and should be **GRANTED IN PART AND DENIED IN PART**.

## I. Defendants' Motions to Strike.

Defendants FSB, PBI and Dykstra move to strike portions of the Hitson Affidavit, the Hart Affidavit, the Hart Deposition, and the Speer Deposition on the grounds that substantial portions of the affidavits and much of the cited deposition testimony are not based on personal knowledge. When analyzing a summary judgment motion, a court must consider "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . . ." *See* FED. R. CIV. P. 56 (c). Materials that do not satisfy the standards of Rule 56 are subject to a motion to strike. *See Noblett v. General Elec. Credit Corp.*, 400 F. 2d 442, 445 (10th Cir.1968). Only admissible evidence may be considered when ruling on a motion for summary judgment. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F. 2d 1467, 1474 (10th Cir. 1985).

Affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; *Hall v. Belmon*, 935 F. 2d 1106, 1111 (10th Cir. 1991). Conclusory and self-serving affidavits are insufficient. *Id*. An affidavit is conclusory when it draws inferences that are not based on the affiant's perceptions or state of mind. *See Servants of the Paraclete v. Great American. Ins. Co.*, 866 F. Supp. 1560, 1565 (D. N.M. 1994). Hearsay evidence that would be inadmissible at trial may not be included in a summary judgment affidavit. *Thomas v. Int'l Bus. Machs.*, 48 F. 3d 478, 485 (10th Cir. 1995). When assessing the admissibility of statements in an affidavit on summary judgment, all reasonable inferences must be resolved in favor of the non-moving

party. *Id.*

Defendants move to strike specific portions of Plaintiffs' affidavits and the deposition testimony of Hart and Wendy Speer on the grounds that the statements and testimony lack foundation and/or are inadmissible hearsay. The statements at issue pertain to Plaintiffs' and Speer's understanding and knowledge of FSB policies, operating procedures, and events that they gained through their own perceptions while employed at FSB. Thus, the statements are based on personal knowledge of Plaintiffs and Speer. Some of the declarations are based on statements that FSB officials made to Plaintiffs and Speer. While such statements may be hearsay, they may or may not be admissible under some hearsay exception. *See Thomas,* 48 F. 3d at 485 (statements of corporate officials may be admissible hearsay as admissions of party opponent).

The bulk of the targeted statements pertain to whether Plaintiffs can establish pretext. While the probative value of the affidavits may be eroded by a dearth of specific supporting facts, the affidavits are not so conclusory that they should be stricken. *See e.g. Thomas*, 48 F. 3d at 485-86 (discounting, but not striking, conclusory affidavit) From the existing record, it is not possible to determine whether or not the statements in the affidavits and deposition testimony are admissible. Because all reasonable inferences must be resolved in favor of the non-moving party, *Thomas*, 48 F. 3d at 485, and the statements may be admissible, Defendants FSB, PBI and Dykstra's Motion to Strike is denied. The Hitson Affidavit, the Hart Affidavit, the Hart Deposition, and the Speer Deposition as submitted by Plaintiffs will be considered in the summary judgment analysis. I express no opinion herein as to whether any evidence will be admitted or excluded at trial.

Defendant Yarrington moves to strike the statement of Paul Follmer dated October 20, 2000, employee exit interviews of Victoria Porras, Rhonda Crawford, Frances Cummins, Dorothy Woods,

David Fetherlin, and Gaylon Herrera and the letter from Herrera as contained in Plaintiffs' Exhibit 6, employee exit interviews of Alicia Rodriguez, Robert Holguin and Connie Gallegos as contained in Plaintiffs' Exhibit 7, and portions of the Hitson and Hart Affidavits because they are hearsay, lack foundation, and are irrelevant. In their Response in Opposition to Yarrington's Motion to Strike, Plaintiffs state that they have been unable to interview Paul Follmer due to some kind of confidentiality agreement between Follmer and FSB that prohibits him from discussing his employment with any person adverse to FSB. I have not relied on the Follmer statement in analyzing the motions for summary judgment. Therefore, the Motion to Strike as to the Follmer statement is denied as moot.

With respect to the rest of the materials, for the reasons discussed in reference to the other Defendants' Motion to Strike, Defendant Yarrington's Motion to Strike is denied. My rulings on the Motions to Strike have no bearing on whether any evidence will be admitted or excluded at trial. Admissibility will depend upon the exact testimony and evidence presented at trial and will be governed by the Federal Rules of Evidence.

## II.     Facts.

The following statement of facts is set forth in the light most favorable to Plaintiffs, with all reasonable inferences from the record drawn in their favor. *See Clanton v. Cooper*, 129 F. 3d 1147, 1150 (10th Cir. 1997). Plaintiff Hitson, a female born on August 25, 1950, was hired as a Branch President of FSB's Silver City, New Mexico branch in October 1996 at a starting salary of $50,000. (First Am. Compl. ¶10; FSB and PBI's Joint Answer ¶ 11, Def. Exs. B and C.) In January 1998, Hitson received a raise to $52,000 per year, and for a time was the highest paid branch president in the Southwest Division. (Def. Exs. B and D.) Hitson maintains that total compensation packages

for male branch presidents were higher than hers because the men were permitted to use of a bank vehicles for personal use while she was not. (Hitson Aff.¶¶ 3 and 24, Pl. Ex. 1.) FSB counters that the vehicles were assigned to branches and not branch presidents and that Hitson was reimbursed for mileage on her own car when she had to travel on business.  (Dykstra Aff., Def. Reply Ex. A; Jensen Aff. Reply Ex. B.)

On March 30, 1998, Ken Recker, Southwest Division President, issued a written warning to Hitson for closing the Turner loan without an adequate appraisal. (Def. Ex. I.)  On April 2, 1998, Recker gave Hitson another written warning for failing to follow loan agreement restrictions on advances on the Superior LLC loan in that an advance was made in March 1998, but the construction period had closed on December 15, 1997. (Def. Ex. H.) On April 7, 1998, Recker put a memo in Hitson's file memorializing the conversation where he gave her the warnings.  (Def. Ex. J.) On August 31, 1998, Recker put a comment in Hitson's personnel file that Hitson had yelled at him during a meeting when questioned about a past due account.  (Def. Ex. K.)  On September 25, 1998, Recker e-mailed a comment to Karla Birgen, FSB's Vice President in charge of personnel and compliance, that Hitson was acting strangely at a managers' meeting.  (Def. Ex. L.)

Division President Jim Bunn told Hitson that Recker gave her the written warnings to "jerk [her] chain." (Hitson Aff. ¶ 8, Pl. Ex. 1.) When Hitson pointed out to Recker that she was just following his instructions with respect to the loans, Recker told her that she would find that "memories [were] real short around here." (*Id*.) Hitson avers that Defendants have fabricated or altered documents in her personnel file.  (Hitson Aff.¶ 9, Pl. Ex. 1.)

On October 16, 1998, Recker gave Hitson her 1998 Annual Review for the time period encompassing October 1, 1997 to October 1, 1998.  (Def. Ex. M.)  She received a "meets minimum"

rating in the teamwork category. (*Id.*) Recker noted that Hitson did not easily accept differing opinions. (*Id.*) Her goals for the next review period were to improve interpersonal skills and be more aware of inter-company command. (*Id.*)

In January 1999, Hitson received a raise to $54,000 per year and had the highest salary for a branch president in the Southwest Division at that time. (Def. Exs. B and D.) In June 1999, Hector Briseño, Deming Branch President, was transferred to the El Paso branch, and received a raise to $60,000. (Def. Ex. D.) Defendants attribute the salary differential between Hitson and Briseño to the greater size and the growth potential of the El Paso market relative to Deming. (Birgen Aff. ¶ 6, Def Ex. O.)

On August 19, 1999, Plaintiffs attended a planning meeting in Albuquerque with other FSB employees. (Yarrington Depo. at 68-69, Def. Ex. N.) Birgen testified that Hitson informed Birgen that Yarrington had "mooned" Hitson and other bank employees while they were driving to dinner during the conference. (Birgen Depo. at 16-17.) Hitson was driving a van full of FSB employees, when Yarrington instructed her to pull up next to a second van full of FSB employees. (Hart Depo. at 120-121.) Yarrington then pulled down his pants and "slapped his butt like a monkey." (*Id.* at 121.) Hitson reported the mooning incident to Birgen, (Hitson Aff. at ¶ 13, Pl. Ex. 1), but did not submit a formal written complaint. (Birgen Aff., Def. Ex. O.) Birgen informed Chuck Hendrickson, a high ranking FSB official, of the incident, but did not otherwise follow up. (Birgen Depo. at 18-19, Def. Ex. O.)

Birgen avers that she never discussed the mooning incident with Yarrington. (*Id.*) Defendant Dykstra testified that he learned of the mooning in May 2000. (Dykstra Depo. at 64, Def. Ex. Q.) Yarrington states that he only found out about Hitson's complaint after she was terminated.

(Yarrington Aff. ¶ 7, Def. Ex. P.) Hendrickson testified that Pat Clebergh, President of the South Dakota Division, had heard about the mooning incident from loan officers and Bill Fuchs also knew about the incident by the Fall of 1999. (Hendrickson Depo. at 19, Pl. Ex. 5.) Hitson expressed her disgust about the incident to her staff in Silver City. (Hitson Aff.¶ 34.) According to Hitson, after she complained about the mooning incident, Yarrington began ignoring her and became increasingly critical of her loans. (Hitson Aff. ¶ 13, Pl. Ex. 1.) Hitson believes that Yarrington's attitude had changed because he found out that she had reported the mooning incident. (*Id.*)

In October 1999, Hitson accepted a transfer to the position of Branch President in Deming. (Def. Exs. B and S.) Hitson received a raise to $57,000 and was at that time the second most highly paid branch president in the Southwest Division and was eligible for a raise to $60,000 in six months. (Def. Exs. B, O, and S.) Hitson states that she believes that the transfer was a set up to terminate her because the Deming branch had a large number of troublesome operation and personnel problems. (Hitson Aff. ¶ 11, Pl. Ex. 1.)

On late October 1999, Yarrington gave Hitson her 1999 Annual Review for the time frame encompassing October 2, 1998 to October 1, 1999. (Hitson Depo. at 244-245, Def. Ex. T.) Hitson objected to the contents of the review, because it was only for a six month period and did not reflect the fact that she had done extensive work in other branches. (*Id.*) Yarrington withdrew the review and stated that he would update it to include work for the entire review period. (*Id.*)

On November 29, 1999, Gena Chacon, the vault teller at the Silver City branch, confessed to Hitson that she had embezzled money from the bank. (FBI Transcript Notes of Genevieve Chacon and Shirley Hitson, Def. Exs. U and V.) Hitson was Chacon's supervisor from 1997 to November 1, 1999. (Def. Ex. V.) In 1997, Hitson's duties included ensuring that policies and procedures were

followed and that the staff had an understanding of the financial institution policies and procedures and providing on-going training. (Vice President/Branch Manager Job Description, Def. Ex. F.) As of 1998, Hitson's job responsibilities also included establishing and attaining standards for balancing by branch tellers. (Position Description Branch President, Silver City, Def. Ex. G.)

Chacon stated that in 1997, she had started taking cash from the bank vault and concealed the shortages before surprise cash counts by modifying cash in/out tickets to account for the differences and by not posting tickets to the general ledger until after the cash count. (Def. Ex. U.) When the shortages became too large to conceal by modified cash in/out tickets, Chacon would purchase money from another bank using a cashier's check, place the money in the vault for the cash count, and hold the cashier's check until the audit had been performed. (*Id*.) Chacon emphasized that Hitson and the other bank employees had no knowledge of her wrongdoing. (*Id*.)

FSB procedures required surprise audits on a monthly basis. (Internal Audit Policy, Def. Ex. W.) Chacon had advance notice of the "surprise" cash counts and was able to cover up the shortfalls. (Wood Depo. at 73, Def. Exs. X, U and V.) FSB had a dual control policy that prohibited anyone from accessing the vault alone. (Security Policy Regarding Vault Access, Def. Ex. Y.) Hitson contends that the embezzlement could not have happened the way Chacon described it over a three year period, that procedures for dual control kept changing, and that dual control was not followed at other branches. (Hitson Aff. ¶¶ 20-22, Pl. Ex. 1.)

On December 17, 1999, Yarrington gave Hitson an employee warning and placed her on six months probation as a result of the embezzlement. (Employee Warning, Def. Ex. Z.) The warning observed that Hitson had been responsible for establishing and maintaining vault and teller balancing standards, having knowledge of departmental operations, policies and procedures and insuring that

audit functions were being followed in accordance with FSB policies and procedures. (*Id.*) Hitson was put on notice that any significant deviation from policies, procedures, or job descriptions might result in action by management.  (*Id.*)  Hitson asked for clarification on the warning and did not sign it. (Hitson Aff. ¶ 23, Pl. Ex. 1.)

On January 5, 2000, Yarrington met with Hitson about complaints he had recently received from her employees. (E-mail from Yarrington to Birgen dated January 6, 2002, Def. Ex. AA.) The employees complained that Hitson was a tyrant, abusive, and demeaning to employees and that she spent most of her time playing Solitaire and other games on her computer. (*Id.*) Yarrington warned Hitson that he was unhappy with her attitude and work ethic and that failure to improve would result in termination. (*Id.*)

On January 14, 2000, Yarrington gave Hitson her annual review covering the period from October 2, 1998 to October 1, 1999.  (Performance Review, Def. Ex. BB.) The review did not include the discovery of the embezzlement, which had occurred outside the time frame of the review. (*Id.*)  Suggestions for improvement included developing a habit of identifying potential problems in advance and monitoring them on a regular basis, not always picking the same one or two individuals to handle key goals, preparing a plan to develop new skills among team members so the workload would be better balanced, resisting the temptation to do everything personally, offering coaching when delegating responsibilities, and reviewing policy guidelines and manuals. (*Id.*)  Overall, the evaluation rated Hitson as meeting or exceeding expectations in every category and she was directed to "keep up the good work." (*Id.*)

On January 14, 2000, Hitson instructed employee Linda Nichols not to book a loan for the Las Vegas, Nevada branch, contrary to specific instructions to Nichols from upper management. (Nichols Memo, Def. Ex. DD.)  When Nichols explained why she needed to book the loan the same

day, Hitson insisted that the loan not be booked. (*Id.*) When Nichols attempted to leave the office, Hitson called her back and belittled her. (*Id.*) Employee Cari Davila also complained that she was degraded and made to feel stupid by Hitson. (Davila Memo dated January 21, 2000, Def. Ex. CC.) Davila indicated that Hitson would mimic her and become angry if Davila asked questions. (*Id.*) Davila indicated that she would quit if Hitson's behavior did not change. (*Id.*)

On January 20, 2000, Yarrington went to the Deming branch and terminated Hitson's employment, citing her attitude, treatment of employees and insubordination. (Email from Yarrington to Birgen and Termination Letter dated January 20, 2000, Def. Exs. EE, FF and GG.) Plaintiff was replaced by Don White, a male under the age of 40. (Hitson Aff. at ¶ 1.)

Hitson asserts that reasons given for her termination were pretextual, maintaining that she was not insubordinate, and that it was Nichols who violated company policies and procedures. (Hitson Aff. at ¶ 6.) Hitson denies any malfeasance of misrepresentation with respect to loans and states that her written loan presentations were changed by Recker.. (Hitson Aff. at ¶ 7.) Hitson points out that Anglo males and young females have yelled, screamed and cursed at employees in front of customers without being disciplined. (Vallejo Depo. at 8-9, 24, 29, 44, 51, 57-68; Cox Depo. at 21, 26, 34, 45; Holguin Depo. at 129, Pl. Ex. 5.) For instance, Laura Villa testified that Division President Ken Recker used vulgar language and Briseño asked Villa if she was good at sex, but she did not put in a complaint " because he was the man." (Villa Depo. at 29 and 56, Pl. Ex. 5.) Several employees complained about Recker and quit due to his abusive behavior, yet Recker was promoted. (Employee Exit Interview Forms, Pl. Exs. 6 and 7.) Aide Vallejo testified that Briseño forged customers' signatures, changed interest rates, and closed accounts without notice to customers, yet he was not disciplined. (Vallejo Depo. at 55, Pl. Ex. 5.) Bill Fuchs testified that Hitson was not fired because of the embezzlement, and that the supervisor of another employee who embezzled money was not

disciplined.  (Fuchs Depo. at 28 and 65, Pl. Ex. 5.)

FSB hired Plaintiff Hart, a African American male, as its Computer Administrator for the Southwest Division on February 13, 1998 at a salary of $25,000 per year.  (Employment Record of Hart, Def. Ex. B.)  At the time, Doug Ronning, FSB's computer administrator for the Eastern Division, was paid $26,500 per year.  (Employment Record of Doug Ronning, Def. Ex. C.)  Hart was initially based out of the Las Cruces branch, but he was moved to El Paso when that branch opened in June 1999.  Hart was initially provided with a company vehicle for traveling to other branches to provide computer support.  (Def. Ex. B.)  In September 1998, Hart's salary was raised to $26,200 per year, which was only $300 per year less than Ronning's salary. (Def. Exs. B and C.)

The job description for Computer Administrator required Hart to retain and expand employee relationships, provide courteous, personal attention to branches, recognize and support all areas of the bank as vital to the long term success of the organization, provide prompt, courteous and correct answers to departmental inquiries, and have the ability to respond to common inquiries from branch staff, and efficiently present information to management and branch staff.  (Position Description, Def. Ex. E.)

On October 28, 1998, Jim Bunn gave Hart his 165-Day Review.  (Performance Review, Def. Ex. F.)  Hart was rated at "meets" in all criteria, except for cost awareness and job knowledge where he was rated at "meets minimum."  (*Id.*)  Hart's goals for improvement were to organize his time to ensure he was spending time on areas of his expertise, to evaluate hardware and software issues to determine whether they could be handled by branch staff, to work with supervisors to evaluate the hardware and software issues, and to train with Pat Weeks on deposit operations. (*Id.*)

Before a Saturday morning training meeting on January 30, 1999, Hart complained in a loud voice that he did not like Briseño or Dan Sievers, another branch president, and complained about

Recker telling him to limit his use of the company credit card. (Def. Exs. G, H, I, J, K, L.) Recker explained took Hart aside and explained that Hart could buy himself lunch on the company card while traveling on business, but that Hart was not supposed to use the card to take other employees out to lunch or to buy pizza for a whole branch. (Def. Ex. H.) Hart complained that he did not believe he was being treated fairly and that he thought a remark that Recker made that people who did not want to work at FSB should find another job was directed at Hart personally. (*Id.*) During the meeting lunch, which was served in the bank lobby, Hart again complained about Sievers and Briseño and then told them in a loud voice that he did not like or respect them. (*Id.*) The incident was witnessed by several bank employees. (Def. Exs. G, H, J, K, L.) Hart admitted in his version of the event that he told Sievers and Briseño that he did not appreciate their attitudes, that he was aware of "all the back stabbing and butt kissing," and that they should not expect deferential treatment from him. (Def. Ex. I.) The incident was reported to Hendrickson, Hart's direct supervisor. (Def. Ex. G.)

Hart avers that his credit card expenses were more heavily scrutinized than those of other bank officers, that he was required to jump through more hoops to get approval for expenditures than Ronning, and that his company vehicle was taken away. (Hart Aff.¶ 4, Pl. Ex. 1.) Hart also reports that he heard Yarrington make derogatory comments about Hispanics and racial minorities, and that Hart was criticized for speaking with a young, blonde, female bank employee at the PBI annual meeting in South Dakota. (Hart Aff.¶ 5, Pl. Ex. 1.)

Hart attended the August 1999 planning conference in Albuquerque. (Hart Aff.¶ 7, Pl. Ex. 1.) Yarrington and Moore contend that Hart picked a fight with Rebecca Moore, Yarrington's Operations Chief, because Hart was upset that the employees were required have meals and spend their off-time together for team-building purposes. (Yarrington Aff.¶¶ 3-5, Def. Ex. N. and Moore Aff. ¶¶ 3-5, Def. Ex. O.) Yarrington and Moore state that the fight was quelled when the employees

left in separate vehicles. (*Id*.) Hart denies that he picked a fight with Moore. (Hart Aff.¶ 6, Pl. Ex. 1.) Hart was in the vehicle with Hitson and Yarrington when Yarrington mooned the other vehicle. (Yarrington Aff. 6, Def. Ex. N.) Moore states that after they arrived at the restaurant, Hart continued to berate Moore until she temporarily left the restaurant in tears. (Moore Aff. 7-8, Def. Ex. O.) Hart denies fighting with Moore. (Hart Aff.¶ 6, Pl. Ex. 1.)

Birgen avers that Hart did not report the mooning incident to upper management. (Birgen Aff. 3, Def. Ex. P.) Hart states that he complained to Birgen that the mooning incident was a form of sexual harassment and that he also complained about the incident to Hendrickson and Steve Ahlers, a high ranking bank official. (Hart Aff.¶ 10, Pl. Ex. 1.) Speer testified that White knew about Hart's complaints. (Speer Depo. at 81, Pl. Ex. 5.) Hart states that he discussed the mooning incident with Ahlers when Ahlers was visiting El Paso about one month before Hart was terminated. (Hart Aff.¶ 12, Pl. Ex. 1.) Within a few weeks, Yarrington advised Hart that Hitson and Hart were "bucking his deal" and that if the "deal keeps getting bucked," then Yarrington would just have to "get rid of [their] asses." (*Id*.)

Yarrington avers that he received at least four complaints about Hart and his treatment of co-workers from May to December 1999. (Yarrington Aff.¶ 8, Def. Ex. N; E-mail from Yarrington to Birgen, Def. Ex. S.) On each occasion, Yarrington spoke to Hart about the complaints from co-workers and his professionalism. (*Id*.) Hart denies that Yarrington ever spoke to him about complaints by co-workers or his professionalism. (Hart Aff.¶ 5, Pl. Ex. 1.) Hart swears that items in his personnel file were doctored. (Hart Aff.¶ 8, Pl. Ex. 1.)

In January 2000, Yarrington gave Hart his Annual Review for the period of October 2, 1998 to October 1, 1999. (Annual Review, Def. Ex. T.) Hart was rated at "exceeds" in job knowledge and quality assurance, in "meets minimum" in analytical thinking and cost awareness, and "meets"

in all other categories. (*Id.*) Hart's goals included completing a stress management course and implementing it into his daily work, becoming more proficient with generating and working with reports, and improving his attitude toward his work, the work environment, and fellow employees.(*Id.*)

In February 2, 2000, Hart was involved in an altercation with Chris McSparren, Leslea Woods and Diana Fierro at the Las Cruces branch. (Def. Exs. S, U, V, W, X, Y, ZZ, AA.) Yarrington investigated the incident and obtained statements from all employees present, as well as a report from a customer who witnessed the incident. (Def. Exs. S, V, W, X, Y, ZZ, AA.) Hart's version of the events differs from the other employees' version of what happened. (*Compare* Def. Ex. U. *with* Def. Exs. S, V, W, X, Y, Z, AA.) Hart points out that the dispute was between him and young white females, who were themselves insubordinate and had caused the computer problem. (Hart Aff.¶ 13, Pl. Ex. 1.) Hart further observes that the white females were never disciplined for their actions. (*Id.*)

On February 3, 2000, Yarrington met with Hart to discuss the incident. (Def. Ex. S.) After reflecting on his prior warnings to Hart, Yarrington decided that Hart's employment should be terminated. (*Id.*) Hart was replaced by an Hispanic male. (Def. Ex. BB.) Hart states that his replacement was paid $7,000 per year more than Hart had been paid, and that the replacement did not have additional specialized training that Hart had undergone. (Hart Aff. ¶ 3, Pl. Ex. 1.)

Hart contends that the reasons given for his termination are pretextual, stating that the February 2, 2000 incident was caused by a white female who refused to follow his instructions, caused the computer problem, and made false accusations against him. (Hart Aff.¶ 13, Pl. Ex. 1.) Hart observes that white managers who had screamed, cursed, and made crude and profane remarks to their employees in the presence of customers were never disciplined. (*Id.*)

Plaintiffs offer additional evidence in support of her claim of discrimination. Hitson states that

she twice applied for the position of branch president of the Las Cruces branch, and twice applied for the position as regional president, but that on all four occasions, younger males with less experience were selected for the jobs. (Hitson Aff.¶ 10, Pl. Ex. 1.) Hitson was belittled and demeaned at meetings and males were favored on their loan presentations. (Cox Depo. at 26; 49; 60-62; Hart Depo at 108-109.) Female branch presidents were not permitted to process their own loans, while male branch presidents possessed such authority. (Hart Depo. at 102, Pl. Ex. 5.) Female branch presidents were closely monitored on their attendance, but male branch presidents were permitted to come and go as they pleased. (*Id.* at 103.)

When Monica Crawford, a female branch president, had an affair with Briseño, who was married, upper management started watching Crawford to find reasons to get rid of her, but left Briseño unpunished. (Hart Depo. at 106, Pl. Ex. 5.) Females over 45 years old were "given an extraordinary amount of duties and the least amount of tools to get the duties done." (*Id.* at 28.) "Babes" were treated better than the older workers. (*Id.* at 87-88.). Employees that were too old or unattractive to participate in Yarrington's "shenanigans" fell into disfavor. (Hart Depo. at 25-26.) Yarrington would personally intercede to make sure Wendy Speer, an attractive woman with whom he had an affair, received preferential treatment for her computer problems. (*Id.* at 41.) Briseño had an abrasive manner and would curse at employees, yet he was not disciplined. (Holguin Depo. at 131-133, 152, Pl. Ex. 5.)

## III. Procedural Background.

On July 10, 2001, Plaintiffs filed a complaint in the Third Judicial District Court, County of Doña Ana, State of New Mexico, alleging civil conspiracy, violation of the Equal Pay Act, intentional interference with employment contract, wrongful discharge, and negligent retention and supervision. On August 23, 2001, Defendants FSB, PBI, and Dykstra removed the action to this Court pursuant

to 28 U.S.C. §§ 1441 and 1446.  On August 24, 2001, Defendant Yarrington consented to removal.

Defendants filed their answers on August 30, 2001.  On November 21, 2001, Plaintiffs' unopposed

Motion to Amend the Complaint was granted and the First Amended Complaint was filed on

November 27, 2001.

In the First Amended Complaint, Plaintiffs allege age, sex and race discrimination in the terms,

conditions and privileges of employment under Title VII of the Civil Rights Act of 1964 ("Title VII"),

42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C.§

621 *et seq.,* and supplemental state law claims.  In Count I, Plaintiff Hitson and Wood allege sex

discrimination against Defendant FSB in violation of Title VII.  In Count II, Plaintiff Hart alleges

racial discrimination against Defendant FSB in violation of Title VII.  In Count III, Plaintiffs Hitson

and Wood allege age discrimination against Defendant FSB.  In Count IV, Plaintiffs Hitson and Hart

allege retaliation against Defendant FSB in violation of  Title VII.  In Count V, Plaintiff allege civil

conspiracy against Defendants Yarrington, Dykstra and PBI.  In Count VI, Plaintiffs Hitson and

Wood  allege violation of the Equal Pay Act against FSB.  In Count VII, Plaintiffs allege negligent

retention and supervision by Defendant Dykstra, FSB and PBI.  In Count VIII, Plaintiffs allege

intentional interference with contractual relations against Defendant Yarrington.  In Count IX,

Plaintiffs Hitson and Hart allege wrongful termination against FSB.  In Count X, Plaintiffs allege

prima facie tort against all Defendants.

On August 6 and 9, 2002, Defendants PBI, Dykstra and Yarrington filed their Motions for

Summary Judgment on the civil conspiracy, negligent retention and supervision, intentional

interference with contractual relations, and prima facie tort claims alleged against them.  On August

9, 2002, Defendants FSB, PBI and Dykstra filed Motions for Summary Judgment as to all claims,

arguing that FSB is entitled to summary judgment on the ADEA and Title VII claims advanced by

Plaintiffs Hitson and Hart because Plaintiffs Hitson and Hart failed to state a prima facie case in that they cannot demonstrate that they were satisfactorily performing their job duties and failed to demonstrate pretext, that FSB is entitled to summary judgment on the wrongful termination claims, that Dykstra and PBI are entitled to summary judgment on the civil conspiracy claims; and that FSB and PBI are entitled to summary judgment on the negligent supervision and retention claims. Defendants FSB, PBI and Dykstra stated in their Motions that they were moving for summary judgment on Count IV, the Title VII retaliation claims. While Defendants supported their Motions with respect to Count IX, the state law wrongful discharge claims, they did not separately argue for summary judgment on Count IV, Plaintiffs' Title VII retaliation claims in their brief-in-chief. Plaintiffs, however, did argue against summary judgment on Count IV in their response brief and Defendants addressed it in their reply briefs. Accordingly, I will analyze whether Defendants are entitled to summary judgment on Count IV.

## IV.     Standard for Summary Judgment.

A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact.' " *Muñoz v. St. Mary Corwin Hosp.*, 221 F. 3d 1160, 1164 (10th Cir. 2000) (quoting Rule 56(c)). When applying this standard, the Court examines the record and makes all reasonable inferences in the light most favorable to the non-moving party. *Id.*

The movant bears the initial burden of establishing that no genuine issue exists as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

issue for trial.'" *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289 (1968)). The movant's initial burden may be discharged by showing there is an absence of evidence to support the non-moving party's case. *See Celotex v. Catrett,* 477 U.S. 317, 323 (1986). When the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying "a lack of evidence for the non movant on an essential element of the non movant's claim." *Adler v. Wal-Mart Stores, Inc.,* 144 F. 3d 644, 671 (10th Cir. 1998). Once the movant meets its burden, the burden shifts to the non-moving party to demonstrate a genuine issue for trial on a material matter. *See McGarry v. Pitkin Co.,* 175 F. 3d 1193, 1201 (10th Cir. 1999).

If the moving party satisfies its initial burden, the party opposing the motion for summary judgment may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing there is a genuine issue for trial as to a dispositive matter for which it carries the burden of proof. *See Muñoz,* 221 F. 3d at 1164. It is not sufficient "to simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co v. Zenith Radio Corp.,* 475 U.S. at 586. An issue of material fact is genuine if a reasonable jury could return a verdict for the party opposing the motion. *See Bullington v. United Air Lines,* Inc., 186 F. 3d 1301, 1313 (10th Cir. 1999). The substantive law at issue determines which facts are material in a given case. *See Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* The district court may only consider admissible evidence submitted to defeat summary judgment. *Starr v. Pearle Vision, Inc.,* 54 F. 3d 1548, 1555 (10th Cir. 1995); *Pastran v. K-Mart Corp.,* 210 F. 3d 1201, 1203 n. 1 (10th Cir. 2000).

## V. Analysis

### A. Whether Defendants Yarrington, Dykstra, and PBI are entitled to summary judgment on Count V, Plaintiffs' civil conspiracy claim.

In Count V, Plaintiffs assert a claim for civil conspiracy against Yarrington, Dykstra and PBI. Specifically, Plaintiffs allege that Yarrington, together with PBI and "various unnamed co-conspirators who were working with entities affiliated with FSB and PBI, aided and abetted and other wise engaged in a civil conspiracy to deprive" Plaintiffs of the rights to which they were entitled as a female over age forty and the sole black male in the entire organization, "and in retaliation for their complaining about and objecting to the illegal harassment, discrimination and misconduct in the workplace." (First Am. Compl. ¶ 48.)

New Mexico substantive law applies to Plaintiffs' supplemental jurisdiction claims. *See BankOklahoma Mortgage Corp. v. Capital Title Co.,* 194 F. 3d 1089, 1103 (10th Cir.1999). Under New Mexico law, the elements of civil conspiracy under New Mexico law are "'(1) that a conspiracy between two or more individuals existed; (2) that specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and (3) that the plaintiff was damaged as a result of such acts.'" *Ettenson v. Burke*, 130 N.M. 67, 72, 17 P.3d 440, 445 (Ct. App. 2000) (*quoting Silva v. Town of Springer*, 121 N.M. 428, 434, 912 P.2d 304, 309 (Ct. App. 1996)). "Civil conspiracy is not of itself actionable; the gist of the action is the damage arising from the acts done pursuant to the conspiracy." *Las Luminarias of the New Mexico Council of the Blind v. Isengard*, 92 N.M. 297, 300, 587 P.2d 444, 447 (Ct. App.1978).

"The purpose of a civil conspiracy claim is to impute liability to make members of the conspiracy jointly and severally liable for the torts of any of its members." *Ettenson v. Burke*, 130 N.M. at 72, 17 P.3d at 445 (*citing Beck v. Prupis*, 162 F. 3d 1090, 1099 n. 18 (11th Cir.1998)). Civil

conspiracy is not a separate, actionable cause of action unless the plaintiff has an actionable civil case against one of the conspirators. *Armijo v. National Sur. Corp.*, 58 N.M. 166, 178, 268 P.2d 339, 347 (1954). "A conspiracy may be established by circumstantial evidence; generally, the agreement is a matter of inference from the facts and circumstances, including the acts of the persons alleged to be conspirators." *Morris v. Dodge Country, Inc.*, 85 N.M. 491, 492, 513 P.2d 1273, 1274 (Ct. App.1973). A plaintiff cannot establish civil conspiracy without presenting specific facts showing agreement and concerted action among defendants. *Durre v. Dempsey*, 869 F. 2d 543, 545 (10th Cir. 1989).

Plaintiffs have presented no specific facts showing agreement and concerted action among Defendants Yarrington, Dykstra and PBI and have failed to allege any specific wrongful acts by the alleged co-conspirators. No jury could find a conspiracy based on the evidence presented by Plaintiffs without engaging in unwarranted speculation. Having examined the record and resolved all reasonable inferences in the light most favorable to Plaintiffs, I conclude that Plaintiffs have failed to demonstrate a genuine issue for trial as to their claim for civil conspiracy. Defendants Yarrington, Dykstra and PBI are entitled to summary judgment on Plaintiffs' civil conspiracy claim as alleged in Count V.

> **B.** **Whether Defendants Dykstra, FSB and PBI are entitled to summary judgment on Count VII, Plaintiffs' claim for negligent supervision and retention claim.**

In Count VII, Plaintiffs allege the tort of negligent retention and supervision against Defendants Dykstra, PBI, and FSB. Specifically, Plaintiffs alleges that these Defendants should have been aware of Defendant Yarrington's wrongful conduct and dangerous propensities, that they had power and authority over him, that it was foreseeable that Defendant Yarrington's tortious conduct would result in harm or injury to Plaintiffs, and that they nonetheless failed to act to protect Plaintiffs. from Yarrington. (First Am. Comp. ¶¶ 55-60.)

An employer may be liable in tort for negligent retention, supervision, and training for the wrongful conduct of an employee even though the employer is not responsible for such acts under the doctrine of respondeat superior. *Pittard v. Four Seasons Motor Inn, Inc.*, 101 N.M. 723, 729, 688 P.2d 333, 339 (Ct. App. 1984); *Valdez v. Warner*, 106 N.M. 305, 307, 742 P.2d 517, 519 (Ct. App. 1987). In order to support a claim for negligent hiring and retention, there must be evidence that the employee was unfit, considering the nature of the employment and the risk he posed to those with whom he would foreseeably associate, and that the employer knew or should have known that the employee was unfit. *Valdez*, 106 N.M. at 307, 742 P.2d at 519 (citing, Restatement (Second) of Agency §213 cmt. d (1958) and *F & T Co. v. Woods*, 92 N.M. 697, 699, 594 P.2d 745, 747 (1979)). Employer liability flows from the employer's duty to those people whom the employer might reasonably anticipate would be injured as a result of retaining the unfit employee. *Valdez*, 106 N.M. at 307, 742 P.2d at 519.

The tort does not require proof of actual knowledge of the employee's lack of skills or unfitness to perform such work, but whether the employer knew or reasonably should have known that some harm might be caused by the acts or omissions of the employee who was entrusted with the position. *Los Ranchitos v. Tierra Grande, Inc.*, 116 N.M. 222, 861 P.2d 263 (Ct. App. 1993) (*citing F & T Co. v. Woods*, 92 N.M. 697, 699, 594 P.2d 745, 747 (1979)). In order to survive summary judgment, Plaintiffs must show that a genuine issue of material fact exists as to whether: (1) an employee of Defendants Dykstra, FSB or PBI engaged in a wrongful act that injured them; and (2) that these Defendants were negligent in supervising or retaining that employee.

Although Plaintiffs have presented evidence that these Defendants knew or should have known that Defendant Yarrington mooned employees, they have presented no evidence linking the mooning incident to their termination. The fact that Yarrington mooned employees does not indicate

21

that Yarrington might unlawfully discriminate against employees on the basis of their age, gender or race, or that he was dangerous in some way. Defendants have discharged their burden by showing an absence of evidence to support an essential element of Plaintiffs' claim for negligent hiring and retention. *Adler*, 144 F. 3d at 671. The burden shifted to Plaintiffs to set forth specific facts showing there is a genuine issue for trial on a material matter as to this claim. *McGarry*, 175 F. 3d at 1201. Plaintiffs have presented no evidence showing that Defendants Dykstra, FSB or PBI were negligent in supervising Yarrington. Having examined the record and resolved all reasonable inferences in the light most favorable to Plaintiffs, I find that Plaintiffs have failed to demonstrate a genuine issue for trial as to their claim for negligent retention and supervision. Defendants Dykstra, FSB and PBI are entitled to summary judgment on Count VII.

> **C.   Whether Defendant Yarrington is entitled to summary judgment on Count VIII, Plaintiffs' claim for intentional interference with contractual relations.**

In Count VIII, Plaintiffs claim that Yarrington is liable for intentional interference with their contractual relationship with FSB. Under New Mexico law, Plaintiffs' at will employment relationship with FSB is deemed a prospective contract and may give rise to liability under this theory. *Kelly v. St. Vincent Hosp.*, 102 N.M. 201, 207, 69 P.2d 1350, 1356 (Ct. App.1984). The tort of intentional interference with prospective contractual relations requires a plaintiff to prove that a defendant "'improperly interfered with the plaintiff's contractual relations, either through improper means or improper motive.'" *Santa Fe Technologies, Inc. v. Argus Networks, Inc.*, 131 N.M. 772, 786, 42 P.3d 1221, 1235 (Ct. App. 2001) (*quoting Diversey Corp. v. Chem-Source Corp.*, 125 N.M. 748, 965 P.2d 332 (1998)). The purpose of this tort is to "impose liability for contractual interference when the means of interfering was not tortious or otherwise unlawful in itself." *Santa Fe Technologies, Inc.,* 131 N.M. at 786, 42 P.3d at 1235.

The plaintiff must demonstrate that the defendant used improper means or acted with an improper motive intended solely to harm the plaintiff. *Silverman v Progressive Broadcasting, Inc.*, 125 N.M. 500, 507, 964 P.2d 61, 70 (Ct. App. 1998) (*citing Kelly*, 102 N.M. at 207, 69 P.2d at 1356)); *see also Clough v. Adventist Health Sys., Inc.*, 108 N.M. 801, 806, 780 P.2d 627, 632 (1989). Accordingly, to survive summary judgment, Plaintiff must show that Defendant Yarrington's *sole* motive in imposing the alleged adverse actions was to harm Plaintiffs. *Id.*

The evidence of record demonstrates that Defendant Yarrington was motivated, at least in part, by a desire to improve performance at FSB. There is evidence that Plaintiffs were abusive to co-workers and that an embezzlement occurred while Hitson was supposed to be supervising the Silver City branch. One of Yarrington's possible motives would be to insure that the bank ran smoothly, without friction between employees or embezzlements. Plaintiffs have failed to come forward with evidence which would create a genuine issue of material fact that Yarrington's *sole* motivation was to harm Plaintiffs. Having examined the record and resolved all reasonable inferences in the light most favorable to Plaintiffs, I find that Plaintiffs failed to demonstrate a genuine issue for trial as to the intentional interference with contractual relationship claim. Defendant Yarrington is entitled to summary judgment on this claim as alleged in Count VIII.

**D.     Whether Defendants are entitled to summary judgment on Count X, Plaintiffs' claim for prima facie tort.**

The elements of a prima facie tort are: (1) commission of an intentional lawful act, (2) the act is conducted with intent to injure Plaintiff, (3) the act resulted in injury to Plaintiff, and (4) the act is without social or economic justification or has insufficient justification. *Schmitz v. Smentowski*, 109 N.M. 386, 394, 785 P.2d 726, 734 (1990). A prima facie tort occurs when a lawful act is performed with an intent to injure and without sufficient economic or social justification, resulting in injury. *See*

*Silverman v. Progressive Broadcasting, Inc.*,125 N.M. at 510, 964 P. 2d at 71. Prima facie tort is intended to provide a remedy for persons harmed by intentional and malicious, but otherwise lawful, acts that "fall outside of the rigid traditional intentional tort categories." *Schmitz*, 109 N.M. at 394, 785 P.2d at 734. While prima facie tort addresses wrongs that otherwise escape categorization, it "should not be used to evade stringent requirements of other established doctrines of law," *Schmitz,* 109 N.M. at 398, 785 P.2d at 738; *Padwa v. Hadley*, 127 N.M. 416, 981 P.2d 1234 (Ct. App.) *cert. denied* 127 N.M. 389, 381 P.2d 1207 (1999).

In determining whether sufficient evidence has been introduced to state a claim for prima facie tort, the court must balance the defendant's malicious intent, if any, against the justification for the injurious act and the severity of the injury. *See Silverman*, 125 N.M. at 512, 964 P.2d at 72; *Beavers v. Johnson Controls World Serv., Inc.*, 120 N.M. 343, 348, 901 P.2d 761, 766 (Ct. App.1995); *Schmitz*, 109 N.M. at 394, 785 P.2d at 734. Plaintiffs allege that Defendants unlawfully discriminated against them, intentionally interfered with their contractual relationship with FSB, negligently supervised and retained Yarrington, wrongfully terminated them, engaged in a civil conspiracy and violated the Equal Pay Act. Because these causes of action require unlawful acts, they cannot form the basis for prima facie tort. *See Silverman,* 125 N.M. 500 at 510, 964 P.2d at 71.

Plaintiffs argue that "mooning" might not be considered sexual harassment. However, mooning does not escape categorization by existing doctrines of law in that it may qualify as sexual harassment or intentional infliction of emotional distress. Plaintiffs may not use prima facie tort as an alternative to meeting the more stringent requirements of other established causes of action. Additionally, Plaintiffs have introduced no evidence of malicious intent on the part of Defendants.

Having reviewed the record and resolved all reasonable inferences in the light most favorable to Plaintiffs, I have determined that Plaintiffs failed to demonstrate a genuine issue for trial as to the

prima facie tort claim. Defendants are entitled to summary judgment Count X.

> **E.** **Whether Defendant FSB is entitled to summary judgment on Count VI, Plaintiff Hitson's Equal Pay Act claim.**

The Equal Pay Act provides in pertinent part:

> No employer ... shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishments at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work in jobs the performance of which requires equal skill, effort, and responsibility and which are performed under similar working conditions, except where such payment is made pursuant to ... (iv) a differential based on any other factor other than sex. . . .

29 U.S.C. § 206(d).

A plaintiff asserting a claim under the Equal Pay Act has the initial burden of showing (1) that she was performing work substantially equal to male employees considering the skills, duties, supervision, effort, and responsibilities of the jobs, (2) that the work conditions were basically the same, and (3) that the male employees were paid more. *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974); *Sprague v. Thorn Americas, Inc.*, 129 F. 3d 1355, 1364 (10th Cir. 1997); *Tidwell v. Ft. Howard Corp.*, 989 F. 2d 406, 409 (10th Cir.1993); *Kenworthy v. Conoco, Inc.*, 979 F. 2d 1462, 1467 (10th Cir.1992). If the plaintiff establishes her prima facie case, the defendant has the burden of persuading the fact finder that there were acceptable reasons that justified the wage disparity. *Tidwell*, 989 F.2d at 409.

Hitson was hired at a salary of $50,000 per year in October 1996, and received a raise to $52,000 per year in January 1998. In January 1999, Hitson received a raise to $54,000 per year and had the highest salary for a branch president in the Southwest Division at that time. These amounts equal or exceed the salary level paid to male branch presidents In June 1999, Hector Briseño, Deming Branch President, was transferred to the El Paso branch, and received a raise to $60,000 per

year.  (Def. Ex. D.)  Defendants attribute the salary differential between Hitson and Briseño to the greater size and the growth potential of the El Paso market relative to Deming.  (Birgen Aff. ¶ 6, Def Ex. O.)  Because El Paso is a significantly larger market than either Silver City or Deming, the work conditions were not the same and the work was not substantially equal.  *Sprague*, 129 F. 3d at 1364-1365.  Based on the salary levels alone, Hitson failed to establish a prima facie Equal Pay Act claim.

However, the term "wage" as defined by the FLSA included any reasonable cost to the employer of furnishing such employee with board, lodging or other facilities.  *See* 29 U.S.C. § 203(m).  Hitson maintains that total compensation packages for male branch presidents were higher than hers because the male branch president given the use of a bank vehicle while she was not. Defendant FSB disputes Hitson's position, and has offered evidence that the vehicles were assigned to branches and not branch presidents, and that Hitson was reimbursed for her mileage.  Because material issues of fact remain as to Hitson's Equal Pay Act claim, summary judgment would be inappropriate on this claim.  Defendant FSB's motion for summary judgment will be denied as to Count VII.

**F.  Whether Defendant FSB is entitled to summary judgment on Count IX, Plaintiffs' retaliatory discharge claim.**

Plaintiffs allege that they were terminated in violation of public policy because they objected to and opposed the hostile environment and illegal discrimination at FSB. Under New Mexico law, the tort of retaliatory discharge represents a public policy exception to the traditional at-will employment rule. *See Vigil v. Arzola*, 102 N.M. 682, 686-90, 699 P.2d 613, 617-21 (Ct. App.1983), *rev'd in part on other grounds*, 101 N.M. 687, 687 P.2d 1038 (1984), *overruled in part on other grounds by Chavez v. Manville Prods. Corp.*, 108 N.M. 643, 649, 777 P.2d 371, 377 (1989). Employees seeking to recover for retaliatory discharge must show a causal connection between their

protected actions and their discharge. *Shovelin v. Central N.M. Elec. Coop.*, 115 N.M. 293, 303, 850 P.2d 996, 1006 (1993). Clearly, " 'an employer cannot fire an employee in retaliation for actions of which the employer is unaware.' " *Lihosit v. I & W. Inc.*, 121 N.M. 455, 458, 913 P.2d 262, 265 (Ct. App. 1996). Defendant FSB asserts that it is entitled to summary judgment on Plaintiffs' retaliatory discharge claims because Plaintiffs are unable to show that Yarrington knew about their complaints regarding the mooning. This position is not supported.

Plaintiffs have presented evidence that Yarrington and upper FSB management were indeed aware of the their objections to the alleged illegal discrimination and the mooning incident. For example, Hendrickson testified that Clebergh and Fuchs knew about the mooning incident by the Fall of 1999. After Hitson complained about the mooning incident, Yarrington began ignoring her and became increasingly critical of her loans. Speer testified that White knew about Hart's complaints. Hart states that he discussed the mooning incident with Ahlers when Ahlers was visiting El Paso about one month before Hart was terminated. Within a few weeks, Yarrington advised Hart that Hitson and Hart were "bucking his deal" and that if the "deal keeps getting bucked," then Yarrington would just have to "get rid of [their] asses." This evidence indicates that Yarrington knew about Plaintiffs' complaints.

Defendant FSB's citation to the temporal proximity issue as discussed in *Kendrick v. Penske Trans. Servs. Inc.*, 220 F. 3d 1220, 1234 (10th Cir. 2000) is unavailing because *Kendrick* discusses a Title VII retaliation claim and not a state law retaliatory discharge claim. Because material facts remain in dispute with respect to Plaintiffs' state law retaliatory discharge claim, summary judgment will not be granted on Count IX.

**G.      Whether Defendant FSB is entitled to summary judgment on Count IV, Plaintiffs' Title VII retaliation claim.**

Title VII prohibits retaliation against employees for asserting their rights under Title VII, providing that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

The burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973) applies to Plaintiffs' Title VII retaliation claim.  *See Pastran v. K-Mart Corp.*, 210 F. 3d 1201 1205 (10th Cir. 2000).  Plaintiffs bear the initial burden of establishing a prima facie case of retaliation.  *Pastran*, 210 F. 3d at 1206.  "If a prima facie case is established, the burden of production shifts, and the defendant must articulate a legitimate, non-discriminatory reason for the adverse action."  *Purrington v. Univ. of Utah*, 996 F. 2d 1025, 1033 (10th Cir.1993).  Once Defendant has articulated a non-discriminatory reason for the action, then the burden shifts back to Plaintiffs to show that the asserted reason is pre-textual.  *Pastran*, 210 F. 3d at 1206.

**1.      Whether Plaintiffs can establish a prima facie case of retaliation.**

In order to establish a prima facie case of retaliation, Plaintiffs must show that: (1) they engaged in protected opposition to discrimination; (2) they were subjected to adverse employment action by their employer; and (3) a causal connection exists between the protected activity and the adverse action.  *See McCue v. Kansas Dep't of Human Resources*, 165 F. 3d 784, 789 (10th Cir.1999).  Plaintiffs bear the initial burden of establishing a prima facie case by a preponderance of the evidence.  *Perry v. Woodward*, 199 F. 3d 1126, 1135 (10th Cir. 1999).

As noted above, Defendant FSB did not support their Motion with respect to Count IV. The

only element challenged by Defendant is causation, and then only by a citation to *Kendrick* for the proposition that no causal connection was established between Plaintiffs' discharges and their earlier complaints. Plaintiffs argue extensively that they have demonstrated the causation element of their prima facie case of Title VII retaliation.

The requisite causal connection may be shown by "'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.' " *O'Neal v. Ferguson Constr. Co.*, 237 F. 3d 1248, 1253 (10th Cir.2001) (*quoting Burrus v. United Tel. of Kans. Inc.*, 683 F. 2d 339, 343 (10th Cir.1982)); *Chávez v. City of Arvada*, 88 F. 3d 861, 866 (10th Cir.1996). "Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation." *O'Neal*, 237 F. 3d at 1253.

The Supreme Court recently observed that cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close." *Breeden v. Clark Co. Sch. Dist.*, 532 U.S. 268, 273 (2001) (*citing O'Neal,* 237 F. 3d at 1253). The Tenth Circuit has held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation, but that a three-month period, standing alone, is insufficient. *See O'Neal*, 237 F. 3d at 1253. The mooning incident occurred on August 19, 1999. Plaintiffs were discharged on January 20, 2000 and February 3, 2000. The facts are disputed as to whether Hart complained and as to whether and/or when Yarrington learned of Hitson's complaints and any complaint from Hart. Material facts remain in dispute as to the temporal proximity between the complaints and the terminations.

Moreover, Plaintiffs may rely on factors other then mere temporal proximity in order to satisfy

the causation element of their prima facie case.  *See Conner v. Schnuck Markets*, 121 F. 3d 1390, 1395 (10th Cir.1997); *see also Marx v. Schnuck Markets*, 76 F. 3d 324, 329 (10th Cir.1996). Plaintiffs have both sworn that Yarrington's treatment of them changed soon before their terminations.  Accepting all well-supported factual allegations as true and construing them in the light most favorable to Plaintiffs leads to the conclusion that Plaintiffs have established a causal connection between their protected conduct and the adverse action.  Summary judgment against Plaintiffs would be inappropriate on the basis of failure to establish a prima facie case of retaliation under Title VII.

>    2.    **Whether Defendant FSB had a legitimate, non-discriminatory business reasons for its treatment of Plaintiffs.**

If a prima facie case is established, the burden of production shifts, and the defendant must articulate a legitimate, non-discriminatory reason for the adverse action." *Purrington*, 996 F. 2d at 1033.  The Supreme Court has recently reiterated that "[t]his burden is one of production, not persuasion ." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).  Once Plaintiff made a prima facie showing of retaliation, the burden shifted to Defendant to articulate a legitimate, non-discriminatory reason for its treatment of Plaintiff.

Defendant FSB offers no absolutely no factual support or legal argument with respect to Count IV beyond its citation ro *Kendrick*.  Defendant has come forward with no legitimate business reason for the adverse action with respect to Plaintiffs' Title VII retaliation claim.  Courts generally do not address issues that the parties failed to brief.  *Johnson ex rel. Johnson v. Thompson*, 971 F. 2d 1487, 1499 (10th Cir.1992).  I decline to manufacture an argument on behalf of any party. Because Defendant FSB failed to support its Motions for Summary Judgment to Count IV, the Motions will be denied.

**H. Whether Defendant FSB is entitled to summary judgment on Counts I, II, and III, Plaintiffs' Title VII and ADEA claims for sex, race and age discrimination.**

Title VII prohibits an employer from discriminating against any individual with respect to the compensation, terms, conditions, or privileges of employment on the basis of national origin. *See* 42 U.S.C. § 2000e-2(a)(1). The ADEA prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age...." 29 U.S.C. § 623(a)(1).

A plaintiff alleging discrimination in violation of either Title VII or the ADEA may prove intentional discrimination through direct evidence, or through indirect evidence using the analysis set forth in *McDonnell Douglas*, 411 U.S. at 802-04. Indirect evidence is often offered in cases alleging discrimination because there is rarely direct evidence of discrimination. *Ingels v. Thiokol Corp.*, 42 F. 3d 616, 620-21 (10th Cir.1994).

Plaintiffs rely on indirect evidence of discrimination to prove their cases. Under *McDonnell Douglas*, Plaintiffs have the initial burden of establishing a prima facie case by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802-804. If Plaintiffs establish a prima facie case, then Defendant FSB must "articulate some legitimate, nondiscriminatory reason" for the challenged personnel action. *McDonnell Douglas*, 411 U.S. at 802-804. Plaintiffs then bear the ultimate burden of demonstrating that Defendant's stated reason is in fact a pretext for unlawful discrimination. *Id.* at 804.

**1. Whether Hitson has established a prima facie case under Title VII or the ADEA.**

Defendant FSB asserts that Hitson has failed to establish a prima facie case under Title VII and the ADEA because she cannot demonstrate that she was satisfactorily performing her job. In order to state a prima facie case for age discrimination under Title VII or the ADEA, Hitson must

show that (1) she was within the protected class (over forty years old or female), (2) an adverse employment action was taken against her, (3) she was doing satisfactory work at the time the adverse employment action was taken, and (4) there is some evidence that the employer intended to discriminate against her on the basis of her age or gender. *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996); *Beaird v. Seagate Tech., Inc.*, 145 F. 3d 1159, 1165 (10th Cir. 1998); *Perry*, 199 F. 3d at 1135.

Defendant does not dispute that Hitson was a female over forty years old, that an adverse employment action was taken against her, or that she was replaced by a younger man. Instead, Defendant argues that Hitson has failed to establish that she was doing satisfactory work at the time she was terminated. In order to meet the second element of the prima facie case, Hitson need only show that her performance was of "sufficient quality to merit continued employment, thereby raising an inference that some other factor was involved in the decision" to discharge her. *Denison v. Swaco Geolograph Co.*, 941 F. 2d 1416, 1420-21 (10th Cir.1991); *MacDonald v. Eastern Wyo. Mental Health Ctr.*, 941 F. 2d 1115, 1121 (10th Cir.1991). Requiring a "'plaintiff in an age discrimination case to demonstrate that [her] performance was flawless unnecessarily collapses the steps suggested by *McDonnell Douglas* by shifting considerations which are more appropriate to the employer's rebuttal phase to the earlier requirement that the employee demonstrate competence to perform the specified work.'" *Denison*, 941 F. 2d at 1420-21 (*quoting Powell v. Syracuse University*, 580 F. 2d 1150, 1155 (2d Cir. 1978)).

At the prima facie stage, the employer's subjective reasons for the adverse action are not properly considered, and should instead be "considered in addressing whether those articulated reasons are legitimate or merely a pretext for discrimination." *Ellis v. United Airlines, Inc.*, 73 F. 3d 999, 1005 n. 8 (10th Cir. 1996). A prima facie showing can be made through credible evidence that

a plaintiff was qualified even if that evidence is disputed by the employer. *Id.* "[A] plaintiff may make out a prima facie case of discrimination in a discharge case by credible evidence that she continued to possess the objective qualifications she held when she was hired, or by her own testimony that her work was satisfactory, even when disputed by her employer, or by evidence that she had held her position for a significant period of time." *MacDonald*, 941 F. 2d at 1121 (citations omitted); *see also English v. Colorado Dept. of Corrections,* 248 F. 3d 1002, 1008 (10th Cir. 2001); *Bullington v. United Air Lines, Inc.*, 186 F. 3d 1301, 1316 n. 11 (10th Cir.1999); *Kenworthy v. Conoco, Inc.*, 979 F. 2d at 1470.

Hitson received favorable performance reviews, including one given to her a week before her discharge in which she was advised to "keep up the good work." Hitson maintained the same objective qualifications she had when she was hired and held her position for over three years. Defendant FSB's arguments go to the weight of the evidence of satisfactory performance, not Hitson's prima facie burden to produce such evidence. Hitson has met her burden of production by introducing some evidence of good performance. Since none of the other elements are at issue, Hitson has established a prima facie case of age and sex discrimination.

> **2.      Whether Defendant FSB has articulated a legitimate, non-discriminatory reason for Hitson's termination.**

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action suffered by the plaintiff. *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F. 3d 1172, 1176-1176 (10th Cir. 2001); *Muñoz,* 221 F. 3d at 1165. The defendant's burden at the second stage of the *McDonnell Douglas* analysis is one of production, not one of persuasion. *Reeves*, 530 U.S. 133, 142 (2000). "To accomplish this, the defendant must clearly set forth, through the introduction of admissible

evidence, the reasons for the plaintiff's rejection." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). Defendant FSB asserts that Hitson was terminated for failing to comply with bank procedures which permitted an embezzlement to go undetected, written complaints concerning Hitson's abusive treatment of subordinates, and failure to follow bank policy and heed written warnings concerning loan originations. Defendant FSB has met its burden of production with respect to showing a non-discriminatory business reason for its action. The burden now shifts back to Hitson to demonstrate pretext.

### 3. Whether Hitson has established that Defendant FSB's stated reasons for her termination were pretextual.

A plaintiff can show pretext by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.*, 108 F. 3d 1319, 1323 (10th Cir. 1997) (quotations omitted). However, "mere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Branson,* 853 F. 2d at 772. "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148.

The plaintiff must establish "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143. This is accomplished by showing "either that a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence." *Bullington*, 186 F. 3d at 1317 (*citing Burdine*, 450 U.S. at 256). One way to show pretext is to provide evidence that the defendant's reasons are unworthy of belief. *Goodwin v. General Motors Corp.*, 275 F. 2d 1005, 1013 (10th Cir.

2002). Another way to show pretext is with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by defendant under the circumstances. *Kendrick*, 220 F. 3d at 1230 (post-*Reeves* case). Yet another way pretext may be shown is with evidence that the defendant acted contrary to an unwritten policy or practice when making the adverse employment decision affecting the plaintiff. *Id.*

The plaintiff "may not be forced to pursue any particular means of demonstrating that [a defendant's] stated reasons are pretextual." *Kendrick*, 220 F. 3d at 1230 (*quoting Patterson v. McLean Credit Union*, 491 U.S. 164, 187-88 (1989)). When assessing a contention of pretext, as opposed to the second element of the prima facie case, it is the manager's perception of the employee's performance, and not the employee's subjective evaluation of his performance, that is relevant. *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1209 (10th Cir.1999). The court may not second guess the business judgment of the employer. *Simms v. Oklahoma ex rel. Dept. of Mental Health & Substance Abuse Servs.*, 165 F. 3d 1321, 1330 (10th Cir. 1999). "[A] prima facie case and sufficient evidence to reject the employer's explanations may permit a finding of liability" under the ADEA. *Kendrick*, 220 F. 3d at 1230 (*quoting Reeves*, 530 U.S. at 142).

Hitson has presented evidence that the reasons given for her termination were pretextual. There is evidence that Nichols was violating company policies and procedures in booking the Las Vegas loan. (Hitson Aff. at ¶ 6.) Hitson denies any malfeasance or misrepresentation with respect to loans. (Hitson Aff. at ¶ 7.) There is evidence that Anglo males and young females abused fellow employee in front of customers without being disciplined. (Vallejo Depo. at 8-9, 24, 29, 44, 51, 57-68; Cox Depo. at 21, 26, 34, 45; Holguin Depo. at 129.) Fuchs testified that Hitson was not fired because of the embezzlement and that the supervisor of another employee who embezzled money was not disciplined. (Fuchs Depo. at 28 and 65, Pl. Ex. 5.)

Hitson offers additional evidence in support of her claim of pretext. Female branch presidents were not permitted to process their own loans, while male branch presidents possessed such authority. (Hart Depo. at 102, Pl. Ex. 5.) Female branch presidents were closely monitored on their attendance, but male branch presidents were permitted to come and go as they pleased. (*Id.* at 103.) There is evidence that upper management targeted Crawford for discipline as a result of an affair, yet left Briseño unpunished. (*Id.* at 106.) Taken together with Plaintiff's prima facie case, these facts tend to show that FSB used Hitson's alleged poor performance as an excuse for terminating her on the basis of her age and/or gender. Hitson has met her burden of showing pretext. *See Reeves*, 530 U.S. at 148; *Goodwin*, 275 F. 2d at 1013. Defendant FSB's Motion for Summary Judgment as to Claims by Shirley Hitson should be denied as to Hitson's claims under the ADEA and Title VII as contained in Counts I and III.

### 4. Whether Hart has established a prima facie case for race discrimination under Title VII.

Defendant FSB asserts that Hart has failed to establish a prima facie case of racial discrimination under Title VII because he cannot demonstrate that he was satisfactorily performing his job. In order to state a prima facie case for racial discrimination under Title VII, Hart must show that (1) he is a member of a racial minority; (2) he suffered adverse employment action; and (3) similarly situated employees were treated differently. *See McDonnell Douglas Corp.*, 411 U.S. at 802; *Trujillo v. University of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1215 (10th Cir.1998).

Defendant FSB does not dispute that Hart is a member of a racial minority, that an adverse employment action was taken against him, or that he was replaced by a non-minority. Instead, Defendant argues that Hart has failed to establish that he was doing satisfactory work at the time he was terminated. As more fully discussed above, Hart need only show that his performance was of

"sufficient quality to merit continued employment, thereby raising an inference that some other factor was involved in the decision" to discharge him. *Denison*, 941 F. 2d at 1420-21; *MacDonald*, 941 F. 2d at 1121.

Hart received satisfactory performance reviews. In his last review, given less than a month before his discharge, Hart was rated at "exceeds" in job knowledge and quality assurance, in "meets minimum" in analytical thinking and cost awareness, and "meets" in all other categories. Hart maintained the same objective qualifications that he had when he was hired and held his position for almost two years. Defendant FSB's arguments go to the weight of the evidence of satisfactory performance, not to Hart's prima facie burden to produce such evidence. Hart has met his burden of production by introducing some evidence of good performance. Since none of the other elements are at issue, Hart has established a prima facie case of racial discrimination.

5.      **Whether Defendant FSB has articulated a legitimate, non-discriminatory reason for Hart's termination.**

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action suffered by the plaintiff. *Gossett*, 245 F. 3d at 1176-1177; *Muñoz,* 221 F. 3d at 1165. The defendant's burden at the second stage of the *McDonnell Douglas* analysis is one of production, not one of persuasion. *Reeves*, 530 U.S. at 142. Defendant FSB asserts that Hart was terminated for written complaints concerning his abusive treatment of co-workers. Defendant has met its burden of production with respect to showing a non-discriminatory business reason for its action. The burden now shifts back to Hart to demonstrate pretext.

6.      **Whether Hart has established that Defendant FSB's stated reason for his termination was pretextual.**

As more fully discussed above, Hart must establish "that the legitimate reasons offered by the

defendant were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143.

Hart can show pretext by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." *Morgan*, 108 F. 3d at 1323. Hart's prima facie case, combined with sufficient evidence to find that Defendant's reason for the discharge is false, may permit the trier of fact to conclude that Defendant unlawfully discriminated. *Reeves*, 530 U.S. at 148. Once again, when assessing a contention of pretext, as opposed to the second element of the prima facie case, it is the manager's perception of the employee's performance, and not the employee's subjective evaluation of his performance, that is relevant. *Shorter*, 188 F. 3d at 1209. The court may not second guess the business judgment of the employer. *Simms*, 165 F. 3d at 1330.

Hart has submitted evidence that the February 2, 2000 incident may have been caused by non-minorities who refused to follow his instructions, caused the computer problem, and made false accusations against him. Even accepting Yarrington's version of the incident as true, there is evidence that white managers who screamed, cursed, and made crude and profane remarks to their employees in the presence of customers were never disciplined, yet Hart was fired for the same type of conduct. Although Hart's showing of pretext is not particularly strong, taken together with his prima facie case, the evidence tends to show that FSB used Hart's alleged poor performance and abuse of co-workers as an excuse to get rid of him based on his race. *See Reeves*, 530 U.S. at 148; *Goodwin*, 275 F. 2d at 1013. Defendant FSB's Motion for Summary Judgment should be denied as to Hart's racial discrimination claim under Title VII.

## VI.  Conclusion.

Upon review of the evidence presented, I have determined that Defendants Motions to Strike should be denied, that Defendants PBI, Dykstra and Yarrington's Motions for Summary Judgment

should be granted and that should be **GRANTED** and that Defendant FSB, PBI and Dykstra's Motions for Summary Judgment should be **GRANTED IN PART AND DENIED IN PART**.

**WHEREFORE,**

**IT IS ORDERED** that Defendants FSB, PBI and Dykstra's Motion to Strike (Doc. 140), filed September 3, 2002, is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Yarrington's Motion to Strike (Doc. 155 ), filed September 3, 2002, is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant PBI's Motion for Summary Judgment (Counts V, VII and X), (Doc. 116), filed August 9, 2002, is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Dykstra's Motion for Summary Judgment (Counts V, VII and X), (Doc. 119), filed August 9, 2002, is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Yarrington's Motion for Summary Judgment on Count V of Plaintiff's First Amended Complaint (Doc. 98), filed August 6, 2002, is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Yarrington's Motion for Summary Judgment on Count VIII of Plaintiff's First Amended Complaint (Doc. 99), filed August 6, 2002, is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Yarrington's Motion for Summary Judgment on Count X of Plaintiff's First Amended Complaint (Doc. 100), filed August 6, 2002, is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants FSB, PBI and Dykstra's Motion for Summary Judgment as to Claims by Shirley Hitson (Doc. 101), is **GRANTED AS TO COUNTS V, VII AND X, AND DENIED AS TO COUNTS I, III, IV, VI, IX**.

**IT IS FURTHER ORDERED** that Defendants FSB, PBI, and Dykstra's Motion for

Summary Judgment as to Claims by Wilbert Hart (Doc. 113), filed August 9, 2002, is **GRANTED**

**AS TO COUNTS V, VII AND X, AND DENIED AS TO COUNTS II, IV, IX**.

_____
**LESLIE G. SMITH**
**UNITED STATES MAGISTRATE JUDGE**